(65 Misc. Rep. 336.)

### LANE v. FENN et al.

(Supreme Court, Trial Term, Monroe County. December 16, 1909.)

1. FRAUD (§ 13*)—GROUNDS OF ACTION—MISREPRESENTATIONS—KNOWLEDGE OF FALSITY.

Where defendants used care in the investigation of the validity of a franchise owned by a corporation which they represented, and were advised by counsel on whom they had the right to rely, they are not liable for fraud in representing the validity and value of such franchise in the sale of stock and bonds of the corporation, though the franchise afterwards proved to be almost worthless.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 4; Dec. Dig. § 13.*]

2. CORPORATIONS (§ 335*)—FRAUD AS AGAINST SHAREHOLDERS.

Fraud by corporate officers and directors in over capitalization of the corporation is not shown by the issue of bonds to the amount of $1,278,000, and capital stock to the amount of $38,597,500 in exchange for $39,-000,000 of the total capitalization of $50,000,000 of another corporation holding a franchise for the construction and operation of telephone lines in a city, for which such other corporation issued $41,000,000 of its stock, where the value of the franchise could not be accurately determined by any well-recognized standard, but could, in good faith, be estimated in the millions.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 335.*]

3. FRAUD (§ 23*)—REPRESENTATIONS IN SALE OF CORPORATE SECURITIES.

Where plaintiff purchased corporate bonds at par and took corporate stock as a bonus knowing that substantially all the assets of the corporation was a franchise for the construction and operation of telephone lines, and that only the future could determine the success of the venture, he is not entitled to maintain an action against the members of a syndicate who negotiated his securities for fraud in inducing him to purchase stock and bonds on the ground of overcapitalization of the corporation, though the franchise afterwards proved almost worthless.

[Ed. Note.—For other cases, see Fraud, Dec. Dig. § 23.*]

4. JURY (§ 136*)—OBJECTIONS—"EACH PARTY" ENTITLED TO CHALLENGES.

In Code Civ. Proc. § 1176, allowing each party six peremptory challenges, the words "each party" do not mean each individual litigant, but

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

mean each side to the controversy to be decided by the jury, so that, if there are only two sides in the case, viz., the prosecution and defense, there should be only six challenges allowed to defendants collectively; but, where there are among defendants conflicting claims or interests which may be determined one way or the other by the jury, duplicate peremptory challenges should be allowed.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 607–618; Dec. Dig. § 136.*

For other definitions, see Words and Phrases, vol. 3, p. 2301.]

5. INDEMNITY (§ 13*)—IMPLIED CONTRACTS.

Though there is no right of contribution among intentional wrongdoers, where one is held liable to a third person for the wrongful act of his agent, the principal, himself innocent, is entitled to indemnity from his agent.

[Ed. Note.—For other cases, see Indemnity, Cent. Dig. §§ 29–35; Dec. Dig. § 13.*]

6. JURY (§ 136*) — OBJECTIONS — SEPARATE CHALLENGES BY JOINT PARTIES — "PARTY."

Where principal and agent are joined in an action for fraud, and the principal may be found liable only for the wrongful acts of the agent so that the interests of defendants may be adverse to each other, each defendant is a "party" within Code Civ. Proc. § 1176, entitling each party to six peremptory challenges.

[Ed. Note.—For other cases, see Jury, Cent. Dig. §§ 607–618; Dec. Dig. § 136.*

For other definitions, see Words and Phrases, vol. 6, pp. 5202–5213; vol. 8, p. 7747.]

7. APPEAL AND ERROR (§ 1045*) — REVIEW — HARMLESS ERROR — IMPANELING JURY.

The error of allowing each joint defendant peremptory challenges as a separate party is harmless, where it does not appear that plaintiff accepted any juror as to whom he would have exercised a peremptory challenge had defendants been restricted to their proper number, and no prejudice appears.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4124–4127; Dec. Dig. § 1045.*]

8. JOINT ADVENTURES (§ 7*)—FRAUD—LIABILITY.

Where the officers and managers of a syndicate, wishing to unite the interests of separate corporations, organized a holding corporation and issued a prospectus in relation thereto, the officers and managers who adopted and recognized the prospectus are liable for any fraud or misrepresentation contained therein, though innocent of any personal wrongdoing.

[Ed. Note.—For other cases, see Joint Adventures, Dec. Dig. § 7.*]

9. JOINT ADVENTURES (§ 8*) — LIABILITIES AS TO THIRD PERSONS — PRESUMPTIONS AND BURDEN OF PROOF.

In an action against members of a syndicate for fraud in inducing plaintiff to purchase certain corporate securities, the burden of proving the agency of some defendants for others in the transaction is on plaintiff in the first instance; but, when he has shown that certain managers had been appointed and acted as such during the entire life of the syndicate, there is a fair inference that those members who subsequently joined the syndicate knew who the managers were, and the failure of such subsequent members to deny knowledge of the appointment of such managers would warrant a finding that they did know of such appointment, and by their failure to object that they acquiesced therein.

[Ed. Note.—For other cases, see Joint Adventures, Dec. Dig. § 8.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

10. JOINT ADVENTURES (§ 8*)—LIABILITIES AS TO THIRD PERSONS—WEIGHT AND SUFFICIENCY.

Evidence, in an action against members of a syndicate for fraud in inducing plaintiff to purchase certain corporate securities, *held* to show that defendants who committed the wrongful acts were acting not only for themselves, but as agents for the other members of the syndicate.

[Ed. Note.—For other cases, see Joint Adventures, Dec. Dig. § 8.*]

Action by Charles M. Lane against Albert O. Fenn and others. Heard on motion for a new trial by plaintiff after a verdict in favor of defendants Sibley, Watson, Holden, Eastman, and Strong; the jury having disagreed as to defendants Fenn, Finucane, Satterlee, and Page. Motion granted.

James M. E. O'Grady, Elbridge L. Adams, and John Desmond, for plaintiff.

Joseph W. Taylor, for defendants Sibley, Watson and Holden.

Walter S. Hubbell, for defendants Eastman and Strong.

SUTHERLAND, J. This is an action for damages for alleged false representations contained in a prospectus offering for sale the bonds and stock of the United States Independent Telephone Company, whereby plaintiff was induced to invest $4,000 in such securities, which turned out to be almost worthless. The jury was instructed that, if they found that no one of the defendants was guilty of any fraud in connection with the preparation or publication of the prospectus, then a verdict in favor of all the defendants must be rendered; but, if they found that some of the defendants were guilty of fraud in connection therewith, those defendants so guilty were liable to the plaintiff, if he was deceived thereby; and that the liability of the other defendants who were not guilty of any fraudulent purpose and had no knowledge of any false statement in the prospectus depended upon whether there was between them and the defendants actually guilty of fraud the relation of principal and agent in the business, in the course of which the prospectus was issued; and that, if such relation was found to exist, the innocent principals were responsible in this action for the damage to the plaintiff caused by the deceit of their agent practiced in the course of his employment; and, if such relation of agency did not exist, then the defendants who were guiltless of any wrongful act were to be exonerated from liability.

The jury evidently agreed that none of the five defendants in whose favor the verdict was rendered was guilty of any personal wrongdoing. In that finding I heartily concur. The jury left undetermined the question whether the remaining four defendants were guilty of fraud, and the verdict exonerating the five defendants, Sibley, Watson, Holden, Eastman, and Strong, can only be explained upon the theory that the jury found that whether the prospectus was false or not, and, irrespective of the guilt of any of the other defendants of such fraud, there was no relation of agency existing between these five defendants and the others, or any of them, in the transaction in the course of which the prospectus was issued. This court is now asked upon the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

whole evidence to set aside the verdict as to the five defendants on the ground that the verdict is contrary to and against the weight of evidence, and a new trial is also asked because certain rulings made by the court during the trial, to which the plaintiff duly excepted, are claimed by the plaintiff to be erroneous.

The questions of law raised by the exceptions will first be discussed. Upon the trial, the court took from the jury as a ground of action the representation made in the prospectus that the New York Independent Telephone Company, the majority of the stock of which was owned by the United States Independent Telephone Company, and was placed under the mortgage given to secure the bonds that were advertised for sale, owned a franchise in the city of New York, acquired under the advice of eminent counsel, under which it was represented to be the purpose of the New York Company to begin as soon as practicable, and in the near future, the construction of an independent telephone system in that city. It was shown at the trial that this franchise was purchased of the Mercantile Electric Company of New York City, a corporation which had acquired it in 1894, by a syndicate comprising the promoters of the New York Independent Telephone Company; the syndicate paying the Mercantile Electric Company $250,000 therefor. The syndicate then included some of the defendants. The other defendants joined the syndicate later. The franchise had been granted by the board of electrical control, a department of the city of New York, whose powers and jurisdiction were conferred by chapter 716, p. 928, of the Laws of 1887. The sufficiency of this franchise for the building and operation of a telephone system within the area of the city of New York as it existed when the franchise was granted was affirmed by eminent counsel to whom the question of its sufficiency was referred by the syndicate purchasing the franchise. It was proven beyond question, in my opinion, that the men concerned in the purchase of the franchise and its sale to the New York Independent Telephone Company had done all that business prudence or good faith required in investigating the validity of the franchise. It turned out, however, that when the New York Independent Telephone Company undertook to lay additional wires in the conduits (which had been occupied by the Mercantile Electric Company for the very limited purpose of operating a burglar alarm system), in order to begin actual work as a telephone company, permission to use the subway ducts was refused; and, in a judicial proceeding instituted on the relation of the New York Independent Telephone Company to enforce the rights which its officials supposed they possessed, the application for a mandamus was refused; and the denial of the application for a mandamus was affirmed by the Appellate Division of the First Department (133 App. Div. 639, 118 N. Y. Supp. 290), on the ground that the power to grant franchises was vested in the common council, without the authority of which body the supposed franchise was ineffectual. A further appeal was taken by the relator, which is now pending in the Court of Appeals.

The prospectus contained an unqualified assertion of the ownership by the New York Independent Telephone Company of a franchise

(without naming the municipal department granting the same); which undoubtedly was intended to be understood as meaning a franchise granted by the municipal body possessing requisite jurisdiction, and sufficient to permit the construction and operation of a general telephone system in the city of New York; and, because ownership of such a franchise was so unqualifiedly asserted, it is now claimed (as it was upon the trial) that the defendants responsible for the issuing of the prospectus are chargeable with fraud for asserting knowledge of a fact which they did not know to be a fact. But it appeared clear that the defendants had proceeded with great care in the investigation of the validity of the franchise, had been advised as to its validity by counsel upon whom they had every right to rely, and that, although they were mistaken, bad faith in that assertion of ownership could not be reasonably inferred from the circumstances surrounding the parties at the time; and it was held that the remedy for the misrepresentation of the fact of ownership was not to be found in an action for fraud (Bell v. James, 128 App. Div. 241, 112 N. Y. Supp. 750), but in a rescission of the subscription contract, the return to the vendors of the bonds and stock purchased, and an action to recover the money from the parties to whom it was paid, on the ground that the parties had been mistaken as to the consideration supposed by them to underlie the subscription contract, the existence of an intent to deceive not being requisite to the maintenance of such an action. This ruling seems to me to be proper. Tryon v. Lyon, 133 App. Div. 798, 118 N. Y. Supp. 5; Bedell v. Wilder, 65 Vt. 406, 26 Atl. 589, 36 Am. St. Rep. 871.

The second ground of fraud which the court declined to submit to the jury concerned the alleged overcapitalization of the United States Independent Telephone Company, based upon its issue of bonds to the amount of $1,278,000, and capital stock to the amount of $38,597,500 in exchange for $39,000,000 of the total capitalization of $50,000,000 of the New York Independent Telephone Company; said $39,000,000 of stock, with $2,000,000 more, having been issued in exchange for the syndicate rights in the New York franchise above mentioned. It was claimed upon the trial that the capitalization was excessive, conceding even the validity of the franchise; and the method by which the first board of directors of the New York Independent Telephone Company was originally constituted, which authorized the issue of the $41,000,000 of stock for the franchise, was emphasized as indicative of fraud. This preliminary board of directors was made up of men selected by the managers of the syndicate who were organizing the companies and dominating the situation. It was shown on the trial that several of said directors of the New York Independent Telephone Company were guaranteed the return of the $1,000 which each had contributed in cash for the 10 shares of the stock of the New York Independent Telephone Company necessary for each to hold in order to qualify as a director, and that before those directors having this agreement took their seats in the board they signed and delivered their resignations to a representative of the syndicate. Similar agreements were made with several (just how many is uncertain) of the first board of directors of

the United States Independent Telephone Company, and resignations were signed in like manner before that board took up the consideration of the. issuing of the stock and bonds of.the United States Independent Telephone Company for the New York Independent Telephone Com-, pany stock.

The bare statement of the facts just given shows how unprepared those members of the boards of directors were to consider, on behalf of the corporations and the stockholders who were to come in, the question of what valuation should be put upon the New York franchise. The statutes of this state, under which the New York Independent Telephone Company was incorporated, and of New Jersey, under which the United States Independent Telephone Company was formed, permit capital stock to be issued for property at its fair value, due consideration being given to its condition and the purposes to which it is to be devoted, and the judgment of a board of directors as to the value of property for which capital stock is thus issued is presumed to be right, and can be assailed only for fraud; but the statutes assume that the members of a board shall exercise independent judgment, and shall be in a position to vote "No" if the price seems excessive, and to vote "Yes" if upon investigation it seems fair. The method followed in the respects pointed out for preparing these boards to exercise their judgment seems to have been singularly unfortunate, although experts were produced before the boards who had given the subject of the franchise and the possibilities of a successful and profitable enterprise founded upon the development of the franchise careful consideration; but, to exercise the fair judgment expected of a director in a matter of such importance, he should be immune from the embarrassment caused by a resignation held over his head. His sense of responsibility to the company should not be weakened by the consciousness that he has nothing to lose because his cash investment is to be returned in any event.

The reasons why the question of excessive valuation was not submitted to the jury were: First. Assuming that a valid franchise existed, as the parties to the transaction then believed, unrestricted as to time and unhampered by adverse conditions as to paying a portion of the receipts to the city, its value would undoubtedly be very large, and could in good faith be estimated in the millions; nor could its value be accurately determined according to any well-recognized standard. Second. The plaintiff, when he subscribed for the bonds and stock, knew, as he testified, that the franchise was substantially all that there was behind the New York end of the investment, and, although he supposed a franchise had been secured, he knew that only the future could determine the success of the venture of installing and operating an independent telephone system in the city of New York. He took the stock as a bonus, in addition to the bonds, for which he paid par, and, being an experienced and intelligent business man, could not have well believed that the stock represented either cash paid by somebody else, 100 cents upon the dollar, or property of the present, saleable, immediate market value of 100 cents upon the dollar. With a valid franchise he knew that the stock represented to a large extent the cap-

italization of hope, and to that extent took it for better or for worse, and I do not think any injustice was done to the plaintiff in the ruling made.

At the opening of the trial, each defendant or group of defendants, represented by separate attorneys of record, demanded the right of separate peremptory challenges, and the court stated that if a divergence of interest was likely to develop, and differences arise between the defendants themselves, to be decided by the jury, duplicate challenges would be allowed. From the preliminary examination of the defendants, which was had before me on an order allowing such examination on motion of the plaintiff, the testimony was such that when the trial opened it appeared to me reasonable to expect that such divergence of interest might arise. It was announced when the trial opened that Mr. Milburn would come into the trial later as counsel for some of the parties, and the court stated in this connection that, if the defendants were so situated that Mr. Milburn could act for them all, only one set of peremptory challenges should be allowed; and it was then stated by counsel that it had not yet been fully determined for whom Mr. Milburn was to act when he came into the case. Accordingly, as there were five defendants or groups of defendants, appearing by separate attorneys, a full set of peremptory challenges was allowed each defendant or group of defendants thus appearing, and, of the 30 challenges thus allowed, 26 were actually used. To this allowance the plaintiff duly excepted, and he now asks that the verdict be set aside because of such ruling.

Under section 1176 of the Code of Civil Procedure, "each party" is allowed six peremptory challenges. There is no reported case in New York where the word "party" in this section of the Code has been construed. Different constructions have been put upon similar words in the statutes of other states, and the practice is not uniform; but it is evident that the words "each party" do not mean each individual litigant. The words mean each side to the controversy to be decided by the jury; and if there are only two sides in this case, viz., the prosecution and the defense, then there should have been only six challenges allowed to the defendants collectively. The question, however, before the court was, whether there was to be an antagonism in interest between the defendants themselves, which would be affected by the verdict of the jury. In Cyc. vol. 24, pp. 356, 357, it is said that in civil actions, where there are several plaintiffs or several defendants, the general rule is that all on one side constitute one party, and are restricted to the number of peremptory challenges allowed a single plaintiff or defendant, but that:

"The rule, however, is to be applied according to the reasons upon which it is based and limited to cases in which the positions of the several parties upon the same side are similar, so, while the fact that several defendants who set up a common defense plead separately does not entitle them to any additional peremptory challenges, the rule is otherwise where they set up separate and distinct defenses presenting different issues, or where the parties on one side, although having a common cause against the other, have conflicting rights among themselves which the verdict of the jury will affect."

And in several states it has been held, in conformity to the rule thus stated, that, where there are among the defendants conflicting

claims or interests which may be determined one way or the other by the jury, duplicate peremptory challenges should be allowed. Stroh v. Hinchman, 37 Mich. 490 (opinion by Cooley, J.); Hundhausen v. Atkins, 36 Wis. 518; Rogers v. Armstrong Co. (Tex. Civ. App.) 30 S. W. 848. And see opinion of Brewer, J., State of Kansas v. Durein, 29 Kan. 688.

The reason for allowing peremptory challenges cannot always be satisfied by restricting the defendants collectively to one set. If, for instance, an action is brought to determine the validity of the probate of a will, and some of the defendants will be benefited by breaking the will and some by sustaining it, if a defendant desirous of breaking the will should challenge peremptorily the first six jurors called, the defendant desiring to sustain the will would be left with no peremptory challenges.

In this case the liability of any one defendant to the plaintiff in case the prospectus were found to be fraudulent might be predicated upon either one of two grounds, according to the proof applicable to him, namely, his personal participation in the wrongful act, or a liability founded not upon any wrongful act or purpose of that defendant, but upon the fact, if it were proven, that some other defendant acting as agent for him in the business of offering the bonds and stock of the United States Independent Telephone Company for sale had committed a fraud upon the plaintiff; and the court, if it had been requested so to do by any of the defendants, would have submitted to the jury, under section 1187 of the Code of Civil Procedure, a question to be answered by a special finding (in case the prospectus was found to be fraudulent and a general verdict rendered against all the defendants), naming the defendant or defendants found guilty of personal participation in the wrongful act, and naming the defendants held liable not for a personal wrong of their own, but because a wrong had been committed by one or more of their associates in the syndicate to whom they had committed the management of the enterprise. Such a special finding would have been proper in the case in order that the rights of the defendants innocent of participation in the wrong might be thus safeguarded, and so that they, without further litigation, might be subrogated to the rights of the plaintiff in case they desired to take up the judgment and enforce it against their codefendants, and thus in turn obtain for themselves indemnity from the actual wrongdoers for the loss brought upon them in the first instance by reason of their joint liability with the wrongdoers to the parties defrauded by the prospectus. While there is no right of contribution among intentional wrongdoers, yet, where one is held liable to a third person by reason of the wrongful act of his agent, the principal, himself innocent, has a right to indemnity from his agent, who has thus misused his authority.

Mr. Keener, in his work on Quasi Contracts (page 409), says: .

"A plaintiff who has incurred a liability, not because of his own personal wrong, but because of the doctrine of respondeat superior, whereby he is held responsible for the wrong of another, can call upon the guilty party to indemnify him for the loss which he has incurred, or can call for contribution from those who in good conscience should share his burden."

It was along this line that the court anticipated that questions might arise between the defendants themselves in the solution of which by the jury one defendant would have an interest adverse to his codefendant, and hence the court adopted the most liberal rule followed in other states in conferring separate sets of peremptory challenges upon the defendants.

After the jury was selected, Mr. Milburn, who was not present during the impaneling of the jury, took part in the proceedings as counsel for the defendants Sibley, Watson, and Holden; but the greater part of the actual work of the trial was performed by him, and he opened the case to the jury on behalf of all the defendants, and he alone summed up the case for all the defendants. So, whatever may have been the expectation of the parties at the beginning of the trial as to a divergence of interest or possible antagonistic rights which would have to be passed upon by the jury, at the end the defendants seemed to consider that their interests were amply conserved by having one counsel speak for them all; and, in the light of that determination by the defendants themselves, it is now clear that, if the court had only allowed the defendants collectively one set of peremptory challenges, the defendants would have had no just cause of complaint.

The uncertainty in cases of this description should be obviated by an amendment of the Code of Civil Procedure settling definitely the practice to be pursued; but I am satisfied that, if too many challenges were allowed the defendants in this case, nevertheless the jurors sworn in after the defendants in the aggregate had used six peremptory challenges were fair-minded and duly qualified jurors; and, it not appearing that plaintiff accepted any juror as to whom he would have exercised a peremptory challenge had the defendants collectively been restricted to six, it would seem that no real harm has come to the plaintiff because of the number of challenges allowed the defense; and, if this were the only question in the case, I would not set aside the verdict upon this ground.

There remains to be considered the question whether the verdict exonerating the five defendants is contrary to and against the weight of evidence. I shall not review the evidence as to the existence of fraud in the prospectus, but shall discuss only the evidence bearing on the responsibility of the managers of the syndicate for the wording and issuance of the prospectus, and the responsibility of the five defendants who have been exonerated by the jury for the acts of the managers of the syndicate in this respect.

First, then, who were the managers of the syndicate, and what operations did they, as such, undertake to carry out? Mr. Satterlee testified that at a meeting of the original syndicate about February 1, 1905, the defendant Finucane was chosen chairman, Charles E. Angle secretary, the defendant Satterlee treasurer, and an executive committee was chosen consisting of the defendants Finucane and Satterlee, and John C. Woodbury. See trial testimony, pages 1118 and 1119, and deposition, pages 15 and 16, where he refers to them as managers. At that time the syndicate raised $250,000 to acquire a franchise for an independent telephone system in the city of New York. The first syndicate consisted of the defendants Finucane, Satterlee, Watson,

and Sibley, and other gentlemen not defendants in this action, viz.,. Messrs. Woodbury, Angle, Duffy, and Frederick Cook, now deceased. Defendant Page of New York was the principal lawyer employed by the syndicate from first to last. He was present at the organization of the syndicate, drew most of the papers, and was the adviser of its managers throughout; and either at first or when the syndicate was later enlarged became a member of the syndicate, contributing to its funds. These gentlemen, with the exception of Page, were interested in the Stromberg-Carlson Manufacturing Company, located at Rochester, which manufactured telephone apparatus, cables, switch boards, etc., and did an extensive business in supplying the independent telephone companies of the country with the equipment necessary for their work, which equipment they could not purchase of the manufacturing concerns allied with the Bell Telephone interests. It was believed by the parties forming this syndicate originally that great opportunity to advance the business of the Stromberg Company would be afforded by securing a franchise and building an independent system in the city of New York, where the Bell Company had no competition; and these considerations led the gentlemen to undertake the acquisition of such a franchise in New York City as would enable them to build and operate an independent system there. Subsequently the franchise owned by the Mercantile Electric Company was acquired. The $250,000 raised by the original syndicate was found to be inadequate to pay all the expenses incident to the acquisition of the franchise and the procuring of such legal and engineering assistance as was requisite, and an enlargement of the syndicate was agreed upon by the original members some time in May, 1905.

Meantime a voting trust agreement had been formed to secure harmony of action among the stockholders of the Stromberg-Carlson Company, and to protect the stock from acquisition by unfriendly interests. When the syndicate was enlarged, 30 or 40 new members were given participation, and their contributions increased the aggregate syndicate funds from the original $250,000 to about $750,000. In the second or enlarged syndicate the defendants Fenn, Eastman, Strong, and Holden were participants. Messrs. Strong and Eastman became members of the syndicate early in the summer. Mr. Holden did not become connected with the affair until October 3d, after the prospectus had been written and six days before it appeared in the public newspapers. It soon became apparent to the prime movers in this affair that the voting trust agreement did not afford sufficient protection against the acquisition of the Stromberg stock by. unfriendly interests, and, accordingly, the formation of a holding company was suggested, with the idea of uniting in it by suitable proceedings the controlling interest in the New York Independent Telephone Company, which had been incorporated for the purpose of taking the New York franchise and the Stromberg-Carlson Company, which was to be the manufacturing base, and such operating telephone companies as might seem desirable to acquire, notably the Rochester Telephone Company, then operating a successful independent system in the city of Rochester; and it seems that the managers of the syndicate, acting

through Mr. Finucane, employed the defendant Fenn to obtain from the Stromberg stockholders options to sell their stock either for cash or, if they chose, to take in lieu of their Stromberg stock the stock and bonds of a holding corporation thereafter to be formed, for which services he received $15,000 from the syndicate; and it was also agreed that he should endeavor to procure similar options upon the majority of the outstanding stock of the Rochester Telephone Company, for which he was to receive the additional compensation of $10,000. Mr. Fenn did secure ultimately options upon a majority of the Stromberg stock. The option agreement signed by the Stromberg stockholders is dated June 22. August 20, 1905, the United States Independent Telephone Company (the holding company) was incorporated under the laws of New Jersey. A temporary board of directors was named, which later gave way October 7, 1905, to a board of 25, of which all the defendants except Fenn were members; the defendant Finucane being elected as president and defendant Satterlee as treasurer of the company.

On the 13th and 14th of September, 1905, contracts were made as follows: Finucane, on behalf of the syndicate, agreed with the New York Independent Telephone Company to transfer the rights acquired by him in the New York franchise to the New York Independent Telephone Company for $41,000,000 of its capital stock, 3 certificates for which stock he directed to be issued as follows: First, 26,000,000 to the United States Independent Telephone Company; second, 13,000,-000 additional to the United States Independent Telephone Company; and, third, 2,000,000 to Albert O. Fenn. He also agreed with the United States Independent Telephone Company to assign to it 39,000,-000 of New York Independent Telephone Company stock in exchange for $1,278,000 of bonds of the United States Independent Telephone Company and $38,597,500 of the United States Independent Telephone Company common stock. These contracts he then assigned to Albert O. Fenn. Fenn made a contract with the United States Independent Telephone Company, whereby, among other things, he agreed to deliver to it a majority at least of the shares of the Stromberg-Carlson Company, for which the United States Independent Telephone Company agreed to pay Fenn as follows: Bonds of the United States Independent Telephone Company to the amount of $125, and stock of the United States Independent Telephone Company, to the amount of $50 for each share of preferred Stromberg, and bonds to the amount of $175 and stock to the amount of $70 for each share of common. Fenn's proposal gave the company the right to elect to pay for said stock either in securities at the rate mentioned, or in cash at the rate of $245 for each share of common and $175 for each share of preferred. The company in its reply elected to take the Stromberg stock in exchange for securities only. October 7th it was agreed between the United States Independent Telephone Company and Fenn that Fenn would turn back to the New York Independent Telephone Company the 2,000,000 of stock, the certificate for which was to be issued to him under the contract with Finucane, and the United States Independent Telephone Company would turn back to the New York Independent Telephone Company 13,000,000

of its capital stock, the certificate for which amount was to be delivered under the contract with Finucane. This put back into the treasury of the New York Independent Telephone Company 15,000,-000 of its stock, to be used for future sale, and left with the United States Independent Telephone Company 26,000,000 of the New York Independent stock which was placed under the mortgage to secure the bondholders of the United States Independent Telephone Company, and left with Fenn the right to receive for the syndicate, when issued, $1,278,000 bonds of the United States Independent Telephone Company, and $38,597,500 of its common stock; and that was the situation on October 9th, when the prospectus was first published.

It was shown upon the trial beyond question that although the syndicate may not have anticipated, at its inception in January, 1905, the formation of a holding company, nevertheless, as the situation developed, the formation of that holding company was the logical method to be adopted for bringing into a unity of interest and policy the New York Telephone enterprise and the Stromberg Company and such independent companies as might be desired; and the managers of the syndicate naturally became the controlling factors in the organization of the United States Independent Telephone Company. They devised its plan of operations, selected its preliminary board of trustees, paid its incorporation tax out of the syndicate treasury, controlled the making of its preliminary contracts, and Mr. Page, in the service of the syndicate, drew the legal papers necessary for the launching of the company.

But it was contended on behalf of the defendants (trial minutes, pages 2105–2109) that, while the syndicate managers did undertake to bring the New York Independent Telephone Company stock and the Stromberg stock under the control of the United States Independent Telephone Company, nevertheless the function and operation of the syndicate stopped with the incorporation of the United States Independent Telephone Company and the making of the contracts for the transfer to it of the stock of the New York Independent Telephone Company, which the syndicate had acquired, and of the Stromberg stock, options on which had been gathered together as the result of the activities of Mr. Fenn; and that all that remained for the syndicate to do at the date of the prospectus was to divide among its members their profits in the enterprise up to that point; and that the issuing of the prospectus and the marketing of the bonds was the work of the United States Independent Telephone Company and its agents only; and that, accordingly, if there were any false representations in the prospectus, the company is the principal to be held responsible and not the syndicate; and that only those defendants could be held personally responsible therefor who aided or connived in the wrongful act.

If the relation of the syndicate to this matter as a controlling element had ceased before the prospectus was devised, then the verdict exonerating the five defendants Sibley, Holden, Watson, Eastman, and Strong from liability was well rendered. If this theory is not supported by the evidence, but, on the contrary, if the syndicate managers, acting as such, not only formed the holding company, but controlled

and directed the marketing of its securities to accomplish a purpose of the syndicate then unrealized, the issuing of this prospectus being adopted by the managers as a means to that end, it follows that, for whatever fraud was committed in the issuing of that prospectus, not only are those defendants liable who personally participated in the wrongful act, but those defendants also are liable who, innocent indeed of any personal wrongdoing, nevertheless appointed or recognized as managers of the syndicate to which they belonged those who committed the wrong. F. A. Bank v. F. S. S. R. Co., 137 N. Y. 241, 33 N. E. 378, 19 L. R. A. 331, 33 Am. St. Rep. 712.

Now, what was the real situation on October 9th, when this prospectus was issued? Had the conceded object of the syndicate then been attained, viz., the uniting under one control of the Stromberg Company and the New York Independent Telephone Company? The majority stock of the latter had been secured; but the situation with regard to Stromberg was this: The defendant Fenn had received from Stromberg stockholders options upon a majority of the Stromberg stock. The options which Fenn had secured were of three kinds: First, options to turn over to Fenn Stromberg stock for the bonds and stock of the United States Independent Telephone Company. Second, options to turn over to Fenn Stromberg stock for part cash and part securities. Third, options to turn over to Fenn Stromberg stock for cash only. The mixed options (for cash and securities both) were not divisible; that is to say, if a Stromberg stockholder owning 200 shares agreed that Fenn could have his stock by paying cash for 100 shares and exchanging United States Independent Telephone Company securities for the other hundred, Fenn could not compel that stockholder to give him the 100 shares for securities unless Fenn also purchased for cash the remaining 100 shares. Now, the shares of stock optioned to Fenn under the first class, for securities only, did not constitute a majority of the Stromberg stock. In order to possess himself of that majority, Fenn would have been obliged (and was obliged) to pay cash for a large amount of stock. His contract with the United States Independent Telephone Company did not require the payment by the company of any cash for any of the Stromberg stock. The managers of the syndicate knew what the situation was. In order to complete the plan which the syndicate had formed and was endeavoring to carry out of bringing the Stromberg Company into the control of the United States Independent Telephone Company, a large amount of cash had to be furnished to Fenn, and the evidence clearly shows that that cash was raised by offering for sale the bonds of the United States Independent Telephone Company, which Fenn was entitled to receive from the company in exchange for the Stromberg stock; and in my opinion the only conclusion that can be harmonized with the evidence before us is that the prospectus was the act of the syndicate managers offering syndicate property for sale through Fenn as their sales agent.

The prospectus does not state that it is issued by the United States Independent Telephone Company, nor does it state that the company is offering its bonds and stock for sale. Prior to its date there is noth-

ing in the minutes of the directors of the United States Independent Telephone Company authorizing the issuing of the prospectus or the appointment of Fenn as sales agent for the company, or providing for the offer of its bonds or stock for sale to the public generally. The subscription contracts (forms A and B) on their face were between the subscribers and Fenn; and in the whole transaction, as reflected in the books of the United States Independent Telephone Company and the various contracts under which the stock and bonds were issued and exchanged, three parties stand out in clear outline, and their relations to each other seem to have been carefully observed: (1) The United States Independent Telephone Company; (2) Fenn (appearing individually, but representing in fact the syndicate for whom he was acting); and (3) the Stromberg stockholders and the cash subscribers for the bonds of the United States Independent Telephone Company. Fenn and the syndicate were the middlemen between the United States Independent Telephone Company, on the one hand, and the Stromberg stockholders and cash subscribers, including the plaintiff, on the other. The cash paid to Fenn or to the Mississippi Valley Trust Company at St. Louis, appointed by Fenn as sales agent under him, was not entered upon the books of the United States Independent Telephone Company as its money. It was drawn out of the bank in which it was deposited, by Fenn's individual check, or paid out by the Mississippi Valley Trust Company upon Fenn's individual order. It is true that the money received by Fenn from cash subscribers was deposited in the Alliance Bank upon an account entitled, "United States Independent Telephone Company Subscription Account"; but that deposit was not then regarded by Fenn or the parties having knowledge thereof as a deposit made by or to the credit of the United States Independent Telephone Company. The title of the account evidently was chosen for the purpose of identifying it, rather than to indicate the ownership of the moneys deposited in said account. It is not reasonable to suppose that Fenn, who was the chief executive officer of the Alliance Bank, would have allowed the bank to pay out the moneys deposited under that account upon his own individual check, if he had regarded the moneys thus deposited as belonging to or under the control of the United States Independent Telephone Company. Fenn was not a director nor officer of the United States Independent Telephone Company. Mr. Satterlee was the treasurer of that company, and Mr. Finucane was its president. Would Fenn have paid out millions of dollars belonging to the United States Independent Telephone Company without a check or voucher signed by the treasurer or some other officer authorized by the United States Independent Telephone Company to draw upon its bank account?

The sales of bonds at Rochester brought in cash amounting to $1,095,000, which was deposited under said account in the Alliance Bank. The sales at St. Louis amounted to $1,565,000; the entire sales realizing $2,660,000 in cash. It seems that in November, 1905, the United States Independent Telephone Company desired to purchase an interest in a telephone company at Indianapolis, and wished to use $250,000 for that purpose, and to effect the purchase through Mr. Breckenridge Jones of St. Louis, who was a director of the United

States Independent Telephone Company. It would seem that the proceeds of the sales of the bonds in St. Louis were then on deposit with the Mississippi Valley Trust Company, and a letter was written to Fenn by Finucane, as president of the United States Independent Telephone Company, of which the following is a copy:

"November 25, 1905.

"Albert O. Fenn, Esq., Rochester, N. Y.—Dear Sir: The United States Independent Telephone Company desires to purchase an interest in the new long distance telephone company of Indianapolis. Accordingly we request you to permit the Mississippi Valley Trust Company to advance to this company the sum of $250,221 for this purpose. This amount to be repaid you by the United States Independent Telephone Company on demand. If you are willing to advance the above amount, will you please instruct the Mississippi Valley Trust Company to pay said sum to Mr. Breckenridge Jones for account of this company.

"Yours very truly,    United States Independent Telephone Company,
"By Thomas W. Finucane, President."

And pursuant to the request contained in that letter, Mr. Fenn authorized Mr. Jones to take $250,000 to make that purchase. Why should the money be repaid .by the United States Independent Telephone Company to Fenn on Fenn's demand, if it was the money of the United States Independent Telephone Company? If there could be any doubt as to the attitude of the United States Independent Telephone Company toward this, $250,000 advanced to Jones, that doubt would certainly be removed by the entry in the journal of the United States Independent Telephone Company concerning the transaction, for in that journal entry Albert O. Fenn is credited with $252,097.32, with this explanatory entry:

"For amount loaned this company out of funds belonging to Albert O. Fenn in the hands of the Mississippi Valley Trust Company, St. Louis. Copies of letters by T. W. Finucane, president, and Albert O. Fenn, relating to this matter, are on file."

The treatment of this $250,000 by the company as a loan to it from Fenn is not singular, for in no instance did the company assume control, in its own right, of any part of the $2,660,000 received by Fenn as the fruits of the prospectus.

Further proof of the fact 'that Fenn (representing the syndicate) stood as the middleman between the Stromberg stockholders and the cash subscribers for United States Independent Telephone Company bonds on the one hand and the United States Independent Telephone Company on the other, is found in the resolutions of the executive committee of the board of directors of the United States Independent Telephone Company, concerning the issuance of bonds and stock for all the Stromberg stock which the company acquired and placed under its mortgage. The mortgage expressly states that it covers 11,591 shares preferred and 41,035 shares of common stock of the Stromberg Company. These shares include not only those acquired through Fenn by the exchange of bonds and stock, but also all those purchased by him for cash up to the time the mortgage was executed. These cash purchases amounted to about $2,000,000. By a resolution of the executive committee passed November 29th, the officers of the United

States Independent Telephone Company were directed to execute and issue to Albert O. Fenn a certificate for 34,520 shares of stock, "full paid and nonassessable, in part payment of stock of Stromberg-Carlson Telephone Manufacturing Company, delivered by said Fenn to this company"; and also it was resolved:

"That in part payment of said stock of Stromberg-Carlson Telephone Manufacturing Company, the proper officers of this company are authorized and directed to deliver to said Fenn an interim bond representing bonds of this company of the aggregate par value of $8,630,000."

Now, in the contract between Fenn and the United States Independent Telephone Company of September 13th and 14th, under which Fenn agreed to deliver Stromberg stock to the company, and the company to give Fenn in exchange therefor its securities, it was provided that for each share of Stromberg preferred Fenn was to receive bonds and stock to the amount of $175, viz., bonds for $125 and stock for $50, and for each share of Stromberg common Fenn was to receive bonds and stock to the amount of $245, viz., bonds for $175 and stock for $70. At this rate, for the entire Stromberg stock placed under the mortgage, Fenn would be entitled to receive bonds to the amount of $8,630,000, which was the exact bond issue provided for in the resolution of November 29th; and he would be entitled to receive stock to the amount of 34,519½ shares, which is just one-half a share less than the amount actually issued to him under that resolution.

Now, in dealing with the Stromberg stockholders, Fenn gave to those stockholders who turned their stock in for the United States Independent Telephone Company securities the exact amount of bonds and stock which he received from the United States Independent Telephone Company for those shares; but, in dealing with the Stromberg stockholders who turned their stock in for cash amounting to about $2,000,000, Fenn paid them only $125 for each share of preferred and $175 for each share of common, and did not give them any stock of the United States Independent Telephone Company. When Fenn turned about and delivered that Stromberg stock for which he had paid cash to the United States Independent Telephone Company, he received from the company bonds equivalent at par to the cash which he had paid out for that stock, and received in addition thereto 40 per cent. ¹of the amount of those bonds in stock, which would amount to about 8,000 shares. These 8,000 shares were the profits gained by Fenn for the syndicate out of the transfer on that portion of the Stromberg stock to the United States Independent Telephone Company; and the bonds received by Fenn representing the 2,000,000 of Stromberg stock purchased by him for cash were turned out by Fenn to the public who had subscribed for the bonds of the United States Independent Telephone Company in response to the prospectus; and the 8,000 shares of stock received by Fenn for the syndicate, as a profit on that transaction, made up part of the stock which went to the subscribers for bonds as a bonus, pursuant to the terms of the prospectus. The issue of this 8,000 shares by the United States Independent Telephone Company would not be a valid issue if the United States Independent Telephone Company was the purchaser at first hand of the Stromberg

stock turned in for cash, for, if the company had purchased those shares for cash directly from the Stromberg stockholders at $125 for preferred and $175 for common, there would have been no consideration for the 8,000 shares issued to Fenn on the purchase of those shares of stock. Those 8,000 shares were not compensation to Fenn for his services in obtaining the options on the Stromberg stock; for such services Fenn was paid $15,000 in cash by the syndicate out of its own fund. The issue in the first instance by the company of those 8,000 shares is validated only upon the theory that all the Stromberg stock acquired by the company was purchased by the company from Fenn for $8,630,000 of bonds and 34,520 shares of stock. So that it becomes very plain that, in acquiring the Stromberg stock and in paying out the $2,660,000 of moneys received by Fenn from the sale of the bonds under the prospectus, Fenn acted as the agent and representative of the syndicate and not as the custodian of moneys actually belonging to the United States Independent Telephone Company.

Now, in support of the defendants' contention at the trial that Fenn sold these bonds to the public as the agent of the United States Independent Telephone Company, the claim was made that his commissions of 5 per cent. upon the $2,660,000 was paid by the company and not by the syndicate. Mr. Fenn testifies that he employed various brokers to assist him in selling the bonds, and employed the Mississippi Valley Trust Company for a similar purpose, and had to pay these brokers and the trust company a commission for their services, and that his own net commissions, after making these payments on the sale of the bonds, only amounted to $29,000; and he testified that in the middle of November these brokers were insisting upon their pay, and in order to satisfy them he applied to Mr. Satterlee (who was then the treasurer both of the United States Independent Telephone Company and the syndicate), for a loan of an amount sufficient to cover his commissions; and it appears that November 15th Satterlee gave Fenn a check on the syndicate funds deposited in the Security Trust Company for $130,600 on the commissions earned. Fenn says this was subsequently repaid by him to the syndicate. Mr. Satterlee testified that he gave the check to Fenn on the syndicate funds, pursuant to direction received from Mr. Finucane, whose authority in the premises he recognized as having been derived from his original election as manager of the syndicate in February, 1905. (Page 1118.) Fenn, it must be remembered, was engaged to sell these bonds by Mr. Finucane before Finucane became a director or officer of the United States Independent Telephone Company.

Now, it seems that on November 23, 1905, a meeting of the syndicate was held, at which it was determined that 300,000 shares of the United States Independent Telephone Company stock which the syndicate then owned should be made deferred stock; that is to say, that no dividends should be paid thereon until 4 per cent. dividends had been paid upon the balance of the common stock. And it was also determined that, of these 300,000 shares, about 200,000 shares should be returned to the United States Independent Telephone Company as treasury stock, leaving in the hands of the syndicate for distribution as their profit 100,000 shares of deferred stock. To accomplish this

result a letter was written by Page and signed by Fenn, to the United States Independent Telephone Company, dated December 9th (Exhibit 69), in which letter it was proposed by Fenn that the articles of incorporation of the company should be amended so as to make deferred the 300,000 shares of stock, and agreed that when the change was made Fenn would assign to the company 74,152 shares of common and 198,740 shares of the deferred stock; and that the company should also pay him the sum of $133,000; and that then the contractual relations between the company and Fenn, and all obligations and liabilities between him or any one claiming under him and the company should cease and determine. That proposition was accepted and carried out.

It will be seen that the 420,495 shares of the capital stock of the company in the hands of Fenn at the time he made this proposition was made up of the 385,975 shares originally given to him in exchange for the New York Independent Telephone stock, and the 34,520 issued to him for the Stromberg stock. After the surrender by Fenn to the company of the common and deferred stock mentioned in his proposition of December 9th, there would remain in the hands of Fenn for the syndicate 46,343 shares of common and 101,260 shares of deferred. From the common thus left in the hands of Fenn, it is evident that Fenn expected to and did get the 40 per cent. bonus stock, amounting to 10,640 shares, which was delivered to the cash subscribers for bonds, besides the stock necessary to fulfill his contract with the Stromberg and Rochester Telephone stockholders, who exchanged their stock for bonds and stock of the United States Independent Telephone Company. It is now claimed that the $133,000 turned over to Fenn, pursuant to the accepted proposition of December 9th, was the commissions which he had earned, and that amount is just 5 per cent. on $2,660,000, the total cash bond sales. The proposition of December 9th does not speak of the $133,000 as commissions, nor is it referred to as commissions in any of the books or documents which are in evidence. The journal entry referring to this payment of $133,000 records the payment to Fenn in bonds of the United States Independent Telephone Company, taken out of its treasury under the contract of December 14th (evidently an error in date which should be December 9th). The date of this transfer of bonds to Fenn, according to the books, was February 14, 1906, and on that day the syndicate treasurer's account shows a deposit of $132,250, which evidently is the counterpart of the transaction evidenced by the journal entry of the transfer to Fenn of the bonds for $133,000 of that date. Whether the $133,000 of bonds transferred to Fenn in fulfillment of the contract of December 9th were given to subscribers under the prospectus, and the cash therefor turned back to the syndicate, is not made clear. However that may be, the United States Independent Telephone Company had benefited by the sale of the bonds and by the turning back to it of the large amount of stock under the agreement of December 9th, and that consideration was sufficient to explain the return to the syndicate of the amount paid by it as commissions for the sale of the bonds, without changing the essential character of the original transaction.

Lastly, in determining the question whether the syndicate was behind the prospectus as its efficient cause, it should be remembered that the stock offered to subscribers for the bonds in this prospectus, at its date, was the stock then owned or thereafter to be acquired by the syndicate. The United States Independent Telephone Company could not issue its stock for cash for any less than 100 cents upon the dollar. In the prospectus, the sale of 17,000,000 of bonds was provided for. If all the Stromberg stock and all the Rochester Telephone stock were turned in to the United States Independent Telephone Company for bonds, those bonds, added to the $1,278,000 bonds given to Fenn as part payment for the New York Independent Telephone stock, would amount in the aggregate to exactly $12,000,000, and the remaining 5,000,000 to make up the 17,000,000, which were offered, would have to be taken for cash. Along with the bonds thus offered for cash was the offer of 40 per cent. common stock, which, upon $5,000,000, would amount to 20,000 shares. If the dealings proposed by the prospectus were to be directly between the United States Independent Telephone Company and the subscriber for its bonds, the company at that time had no stock whatever with which it could lawfully fulfill the conditions of the prospectus and pay the 40 per cent. to the cash subscribers. The stock which was to go to them was, at the date of the prospectus, then owned by the syndicate, except that part thereof which might result from the stock profit realized by Fenn in turning in Stromberg stock purchased by him for cash, which did not produce enough stock to furnish the bonus going to the cash subscribers for bonds. The syndicate was therefore offering for sale, as part of the securities to be taken by the public, the common stock of the United States Independent Telephone Company owned by the syndicate and in the hands of Fenn, whose name was subscribed to the prospectus.

Fenn was given no authority to sell bonds for the company as its agent. He held an option to purchase from the company its bonds for cash at par up to the total of $17,000,000 (except the $1,278,000 given in part for New York Independent Telephone Company stock and the bonds given in exchange for Stromberg and Rochester Telephone stock). The bonds optioned by the company to Fenn for cash carried with them to him no bonus stock; but, when offered by Fenn to the public under the prospectus, the same bonds were to carry a bonus of 40 per cent. stock furnished by the syndicate from the sources pointed out.

It would seem therefore that the syndicate, through Fenn, was the vendor of the stock and bonds offered for sale in the prospectus; and, if the prospectus in fact was false and fraudulent, those members of the syndicate who authorized the appointment of the managers who issued the prospectus, and those members of the syndicate who, coming into the syndicate after the managers were appointed, approved of the action which had already been taken concerning such appointment, are liable for any fraud committed by those managers in thus offering the property of the syndicate for sale.

It was not held at the trial that a member of the syndicate, by simply purchasing an interest in the syndicate venture, became as a matter of

law responsible as a partner for the acts of the other members. It was submitted to the jury as a question of fact whether the defendants constituted Finucane, Page, Satterlee, or Fenn their representatives or agents for syndicate matters, and no exception was taken by the plaintiff to the submission of this question of agency as a question of fact to be determined by the jury.

In Hornblower v. Crandall, 7 Mo. App. 220, affirmed 78 Mo. 581, a well-considered case, it is said:

"Promoters of companies are not, indeed, merely as such, each other's agents, or liable for each other's acts. It was formerly held that persons engaged in establishing companies were partners, as they were acting together for a common object with a view of sharing gains; but such is not now the accepted doctrine. Lindsay on Part. (Ed. 1878) pp. 31, 54, 240, and cases cited. An association for forming a company is not necessarily a partnership, and the question is whether there is a basis of fact for the legal implication of agency. The principal is liable for the torts of his agents committed in the course of the principal's business. It is no defense that the principal has not authorized the deceit, if it is committed in the matter intrusted by the principal to his agent. Where the deceitful contrivance is for the principal's benefit, and done in the course of his business, the question, at its best, is: Who of two innocent parties shall suffer? And the rule is, as it ought to be, that he who has put his trust in the wrongdoer, and held him out to the world as a person to be dealt with, shall bear the burden of his acts."

The defendants Sibley and Watson participated in the organization of the syndicate, and must have consented to the selection of the managers; and if the defendants Holden, Eastman, and Strong came into the syndicate knowing that managers had been appointed to control the affairs and shape the policy of the syndicate, and they, by silence or other conduct, acquiesced in the selection that had already been made, they then constituted the managers their agents for the remaining business of the syndicate. The defendants Holden, Sibley, and Eastman were not specifically interrogated as to their knowledge upon this point. The burden of proving agency rested upon plaintiff in the first instance; but, when the plaintiff proved that the managers had been appointed and acted as such throughout the entire life of the syndicate, the inference would seem to be a fair one that those joining the syndicate subsequent to the appointment knew who the managers were, unless the contrary were shown; and the failure of the defendants Holden, Eastman, and Strong to testify that they did not know of the appointment of such managers would seem to leave the only permissible conclusion to be drawn by the jury that they did know of such appointment, and by their failure to object that they acquiesced therein.

If these conclusions are sound, it would follow that it is the duty of this court to set aside the verdict in favor of Messrs. Holden, Sibley, Watson, Eastman, and Strong, and order a retrial of the entire case.

Therefore an order may be entered setting aside the verdict in favor of the five defendants Sibley, Watson, Holden, Strong, and Eastman, on the ground that the verdict is contrary to and against the weight of evidence, and granting a new trial, upon the payment by plaintiff of one term fee and all the taxable disbursements of said five defendants at the trial with the costs of this motion.